**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

January 13, 2025

Susan W. Waesco, Esquire
Thomas P. Will, Esquire
Courtney Kurz, Esquire
Taylor A. Christensen, Esquire
Morris Nichols Arsht & Tunnell LLP
1201 North Market Street
Wilmington, Delaware 19801

Matthew F. Davis, Esquire
David A. Seal, Esquire
Callan R. Jackson, Esquire
Adriane M. Kappauf, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, Delaware 19801

> RE: *Comcast Cable Communications Management, LLC v. CX360, Inc.*,
> C.A. No. 2024-0991-LWW

Dear Counsel:

On November 13, 2024, I issued a letter opinion ordering Comcast Cable Communications Management, LLC to post a $5,185,944 bond in connection with a status quo order it requested.[1] My October 3 status quo order maintained the parties' Master Services Agreement ("MSA").[2] Now, I write regarding CX360, Inc.'s subsequent motion to increase the amount of the bond.[3]

---

[1] Letter Op. Regarding Bond (Dkt. 79) ("Letter Op.") at 5.

[2] Dkt. 16.

[3] Def.'s Mot. to Increase Bond Amount (Dkt. 106) ("Mot.").

CX360 asserts that the record developed at trial shows that the bond should be increased.[4]  In response, Comcast calls CX360's request for a larger bond "improper and unsubstantiated," emphasizing that several of CX360's arguments were rejected in my prior letter opinion.[5]  But trial occurred in the interim, which provides a broader factual record from which to assess CX360's position.[6]  CX360's request is also procedurally proper.  "[A] court's initial estimate [for a bond] need not necessarily bind the parties throughout the proceedings; they may later petition the court to raise or lower the amount of security."[7]

When a defendant seeks an increase to a bond amount, the court considers whether circumstances "warrant adjusting the amount of the [existing] bond to protect [the] [d]efendant[] from the potential harm [it] could suffer" before an action's completion.[8]  As with an initial bond, a request to increase a bond must be

---

[4] *Id.* ¶ 4.

[5] Pl.'s Opp'n to Def.'s Mot. to Increase Bond Amount (Dkt. 125) ¶¶ 5-6.

[6] *CPM Indus., Inc. v. Fayda Chems. & Mins., Inc.*, 1998 WL 1809921, at *2-3 (Del. Ch. May 14, 1998) (adjusting the amount of the bond to account for unforeseen business developments that transpired after an injunction was issued).

[7] *Emerald P'rs v. Berlin*, 712 A.2d 1006, 1010 (Del. Ch. 1997); *see also Petty v. Penntech Papers, Inc.*, 347 A.2d 140, 144 (Del. Ch. 1975) ("[D]efendants are free . . . to seek an increased bond if they deem it necessary and upon a proper showing.").

[8] *Id.*

supported "either by facts of record or by some realistic as opposed to a yet-unproven legal theory from which damages could flow to the party enjoined."[9] "Because actual damages are uncertain, and because a wrongfully enjoined party has no recourse other than the security, the court should 'err on the high side' in setting the bond."[10] The amount of the bond is within the court's discretion.[11]

CX360 proposes two different increased bond amounts. The larger request is speculative, and I reject it as such. The smaller request, however, is generally appropriate with a downward adjustment.

### A. CX360's $40.6 Million Request

CX360 argues that the bond should be increased by $40,660,000 to account for "previously unquantifiable harms" it purportedly suffered "due to this expedited

---

[9] *Petty*, 1975 WL 7481, at *1; *see also Serv. Corp. of Westover Hills v. Guzzetta*, 2008 WL 5459249, at *1 (Del. Ch. Dec. 22, 2008) (discussing the standard applied when the court granted a petition to increase security (citing *Petty v. Penntech Papers, Inc.*, 1975 WL 7481, at *1 (Del. Ch. Sept. 24, 1975))).

[10] *Guzzetta v. Serv. Corp. of Westover Hills*, 7 A.3d 467, 470 (Del. 2010) (citing *Mead Johnson & Co. v. Abbott Lab'ys*, 201 F.3d 883, 888 (7th Cir. 2000)); *see also Steward Health Care Sys. LLC v. Tenet Bus. Servs. Corp.*, 2022 WL 3025587, at *6 (Del. Ch. Aug. 1, 2022) ("An error in setting the bond too high thus is not serious, but an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." (citation omitted)); *CPM Indus.*, 1998 WL 229534, at *3.

[11] *See Guzzetta*, 7 A.3d at 471 (stating that "a decision fixing the amount of a bond is a matter of discretion").

litigation and the negative publicity arising from it."[12]  It breaks down this amount

as (1) $15,600,000 in potential lost revenue from customers who may defect,[13] and

(2) $24,060,000 in "anticipat[ed]" lost revenue growth for 2025 to 2027.[14]  CX360

does not explain why it looks to lost revenue and revenue growth as the measure of

its alleged future harms.[15]

I decline to increase the bond by these amounts for two reasons.  First, it is

not apparent why the status quo order would cause employees or customers to leave

CX360.[16]  CX360's primary concern seems to be that the lawsuit has caused it

reputational harm.  Even if that were true, the status quo order itself would not be

the cause of the possible revenue loss CX360 fears.

---

[12] Mot. ¶ 22.

[13] *Id.* (noting that "CX360 has five customers operating in the cable industry" and if it were to lose these customers because of the status quo order, it "would lose 20% of its yearly revenue or $5,200,000 per year" and "would take up to three years to replace this revenue with new customers and recover from the reputational impact").

[14] *Id.* ("CX360 planned to achieve incremental revenue growth [of] $120,300,000 in new revenue [for 2025-2027] . . . CX360 anticipates that it will suffer a 20% loss in growth due to the impact of the [status quo order], resulting in a loss of approximately $24,060,000."). Although CX360 seeks $40,660,000, $15,600,000 plus $24,060,000 equals $39,660,000.

[15] Since presumably there are also costs related to servicing customers and employee retention, lost EBITDA or lost profits due to the status quo order might be more instructive.

[16] *Cf. Kronenberg v. Katz*, 872 A.2d 568, 609 (Del. Ch. 2004) (discussing that accusations of wrongdoing are necessarily public in every lawsuit).

Second, CX360's estimates are entirely speculative.[17] CX360 points to no customer or employee that it has lost (or will imminently lose) due to the lawsuit, much less because of the status quo order. Instead, it makes the unsupported assertion that it "*would* lose 20% of its yearly revenue" if it *were* to lose all five of its customers in the cable industry and that it "*anticipates* it will suffer a 20% loss in growth due to the impact of the [status quo order]."[18] No backup for these estimates is provided.

## B. CX360's $19.9 Million Request

CX360 argues that, alternatively, the bond should be increased to $19,892,000.[19] This amount is based on CX360's contention that, absent the status quo order maintaining the MSA, Comcast would have signed a transition services agreement with terms favorable to CX360 (the Novation Agreement).[20]

---

[17] *Cf. BTG Int'l, Inc. v. Wellstat Therapeutics Corp.*, 2017 WL 4151172, at *18 (Del. Ch. Sept. 19, 2017) (declining to award damages based on a speculative sales forecast).

[18] Mot. ¶¶ 23-24 (emphasis added).

[19] *Id.* ¶ 21.

[20] *Id.* ¶¶ 19-21.

After trial, I found that Comcast neglected to negotiate with CX360 on the Novation Agreement.[21]  But I did not find that Comcast was likely to have signed the Novation Agreement as CX360 presented it.  In fact, it seems likely that Comcast would have secured some concessions from CX360.

Still, this court must "err on the high side in setting the bond."[22]  As such, I believe it is appropriate to increase the bond to reflect the harms CX360 complains of.  The increase will be an amount equal to the difference between (1) what Comcast paid under the MSA and (2) what it would have paid had it entered into the Novation Agreement upon CX360's termination of services.

CX360 failed, however, to provide specific information supporting its contention that the Novation Agreement's value is $19,892,000.  CX360 seems to have pulled this number from its prior briefing, which computed the value of the bond by adding "the value of the Novation Agreement, $21.4 million, plus $1.4 million in employment retention costs" and "subtracting $3.082 million to reflect theoretical payments from Comcast for November and December 2024."[23]

---

[21] *Comcast Cable Commc'n Mgmt., LLC. v. CX360, Inc.*, 2024 WL 5251997, at *8 (Del. Ch. Dec. 31, 2024) (finding that "Comcast refused to engage with CX360 on the Novation Agreement"); *see also id.* at *17.

[22] *Guzzetta*, 7 A.3d at 470 (citation omitted).

[23] Letter from CX360's Counsel Regarding Bond (Dkt. 53) 3-4 (cleaned up).

I see several problems with adopting this figure wholesale. First, it is inclusive of $1,400,000 in employee retention costs that CX360 previously sought but no longer raises, which causes me to wonder whether such payments were made. Second, the $21,400,000 million purported value of the Novation Agreement is inexplicably $400,000 higher than the $21,000,000 CX360 advanced in prior submissions.[24] Third, although CX360 estimated that Comcast's hypothetical November and December payments would total $3,082,000, my prior ruling adopted Comcast's estimate of $3,362,000.[25] Fourth, even taking CX360's numbers at face value, its calculations are erroneous.[26]

Adjusting for these issues, a responsible bond amount cannot exceed $16,483,548. This sum is equal to an estimated $21,000,000 Novation Agreement value, less $3,362,000 of payments that Comcast already made in November and

---

[24] *See* Joint Submission Regarding the Parties' Positions on the Amount of an Appropriate Bond (Dkt. 18) 6; Decl. of Rebecca Jones Pursuant to 10 *Del. C.* § 3927 in Supp. of Def.'s Req. for a Bond (Dkt. 19) ¶ 10 ("Under the [N]ovation [A]greement, Comcast would have paid CX360 $21 million for services through the end of 2025.").

[25] Letter Op. 4 & n.12.

[26] $21,400,000 + $1,400,000 - $3,082,000 = $19,718,000.

December and $1,154,452 in payments owed under the MSA for prorated January services.[27]

*       *       *

CX360's motion to increase the amount of the bond is granted. The bond must be increased to $16,483,548. Comcast is therefore ordered to post a $11,297,604 bond within ten days.[28]

The bond pertains to the period that CX360 was required to continue performing under the MSA because of the status quo order. Since I held after trial that CX360 had the right to terminate the MSA for convenience, the status quo order will be deemed lifted upon the filing of the bond on the docket.[29]

---

[27] Comcast anticipated it would pay $1,556,000 under the MSA for January 2025. *See* Letter from Comcast's Counsel (Dkt. 52) 2. The status quo order is deemed lifted—meaning the parties are no longer required to perform under the MSA—10 days from the date of this letter. *See infra* notes 28-29 and accompanying text. Accordingly, I calculate the amount that Comcast owes CX360 for ten days of service as follows: $1,556,000 x (23/31) = $1,154,452.

[28] This amount is equal to $16,483,548, less the prior bond amount of $5,185,944. For the avoidance of doubt, Comcast must still pay CX360 for the services it received under the MSA in January. *See supra* note 27 and accompanying text.

[29] *See Comcast*, 2024 WL 5251997, at *1. Should any party believe that the status quo order should remain in place, it may promptly file a letter explaining its position. The bond will remain in place regardless pending the outcome of CX360's request for damages.

To be clear, by increasing the bond, I am not finding that CX360 is entitled to any damages.[30] That determination must await a forthcoming hearing on whether the status quo order was improvidently granted and whether CX360 suffered losses as a result.

IT IS SO ORDERED.

Sincerely yours,

/s/ *Lori W. Will*

Lori W. Will
Vice Chancellor

---

[30] *See Guzzetta*, 7 A.3d at 471 ("It should be remembered that the bond does not entitle the enjoined party to *any* damages, and the cost of a bond typically is a very small fraction of its face value.").